Richard O. BOVEY and Michelle Bovey, Plaintiffs,

v.

The CITY OF LAFAYETTE, INDIANA, and Dennis Brady, Defendants.

No. L 82–116.

United States District Court,
N.D. Indiana,
Hammond Division at Lafayette.

May 23, 1984.

William K. Bennett, Lafayette, Ind., Kelly Leeman, Logansport, Ind., Courtney B. Justice, Delphi, Ind., for plaintiffs.

Edwin L. Gagnon, Mary Ann Oldham, Indianapolis, Ind., E. Kent Moore, Lafayette, Ind., for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

### I.

This case was filed on the 27th of December, 1982. Originally claims were asserted under Title 42 U.S.C. §§ 1983 and 1985. The jurisdiction of this court is invoked on the basis of federal question jurisdiction under Title 28, U.S.C. § 1331 and § 1343(3).

As a preliminary this court takes judicial notice of the earlier proceedings in this case, particularly those on the 5th of May, 1983, in which any and all punitive damage claims were dismissed as against the City of Lafayette, Indiana, under authority of *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), and the complaint was dismissed as against the defendant, Ronald T. Milks, individually and as Chief of Police of the Police Department of the City of Lafayette, Indiana, with leave to file an amended complaint by June 1, 1983. No such amended complaint was filed. This memorandum is intended to comply with Rule 52 F.R.C.P.

The parties by counsel very explicitly in writing and orally waived their right to a trial by jury under the Seventh Amendment of the Constitution of the United States. This case was tried before the court without the intervention of a jury for seven trial days beginning on April 2, 1984 and concluding with final arguments on April 11, 1984. The case was tried by highly competent and experienced trial counsel. The intensity of emotion between the principals was readily evident from their conduct in the courtroom throughout this trial as well as that of their "camp followers" who filled the courtroom.

At the close of the plaintiff's evidence on April 9, 1984 a directed verdict was granted on all claims asserted against the defendants, Edward Moser and Dan Money, by all plaintiffs. Also, at that time a directed verdict of dismissal was granted as to all claims by plaintiffs, Gary Bovey and Mark Bovey, as to all remaining defendants.

The principal focus of this court's decision must be measured by standards embedded in the Constitution of the United States under the Fourteenth Amendment and the remedies that are found in 42 U.S.C. § 1983. (It is also necessary to deal briefly with pendent claims that are asserted under the substantive law of the State of Indiana.)

The principal actor in this local drama is Richard Bovey, a well educated, intellectually sophisticated, aggressive and some-

times intimidating advocate, both in and out of the courtroom, who is both blessed and cursed with an advanced case of self-righteousness. It is beyond any doubt that there is a social need for lawyers such as Richard Bovey who sometimes put our system to its supreme test and once in awhile help in the process of cleansing the secular temple. However, the record in this case demonstrated that an excessive amount of time has been spent on this otherwise minor incident by a great number of the members of the legal profession in Lafayette, Indiana, by the local judiciary in Tippecanoe County, Indiana, by the Police Department in the City of Lafayette, and indeed by this court itself.

The other principal actor in this local cause celebre is Dennis Brady who has maintained his athletic handsomeness from twenty years ago when he was Mr. Basketball in Indiana, which under the prevailing cultural Hoosier mores is the rough equivalent to secular sainthood. Dennis Brady has the arrogance and agressiveness born of public adulation. It is beyond any dispute that those characteristics can often serve a police officer, such as Brady, very well. In this case they did not.

On November 29, 1982 at approximately 9:00 o'clock P.M. Richard Bovey, with his wife and two children, was traveling east on Union Street, Lafayette, Indiana, in a white VW station wagon. When he was approximately one-fourth mile west of the intersection of Union and Creasy, defendant Officer Brady clocked his speed, by radar, at 49 m.p.h. in a 30 m.p.h. posted speed zone. Officer Brady, who had a civilian, Brent Lank, riding with him, pulled in behind the Bovey vehicle at the intersection and when they crossed Creasy, he turned on his red top lights to stop him.

Bovey pulled into a church parking lot on the southeast corner of the intersection and Officer Brady followed him. When the vehicles came to a stop they were anywhere from 15 to 40 feet apart. Both Bovey and Brady got out of their vehicles and they met at the rear of Bovey's vehicle. Brady's vehicle lights were shining at the rear of Bovey's vehicle.

Bovey asked Brady why he was stopped and informed Brady that he was an attorney. Brady informed Bovey that he was speeding, 49 in a 30, and pointed to where he had clocked his speed. Brady asked to see Bovey's driver's license and vehicle registration. Bovey produced his driver's license and replied that he couldn't have been speeding because he was slowing down for the intersection. Brady asked to see his vehicle registration. Bovey then asked Brady if he was going to give him a ticket and again informed him that he was an attorney. Brady assured Bovey that he was going to give him a ticket for speeding.

Bovey then proceeded to the passenger side of his vehicle and opened the glove compartment and again informed Brady that he wasn't speeding. At this time, Mrs. Bovey, sitting in the rear of the vehicle on the passenger side, reached out through the window and touched Brady's left arm, protesting the speeding charge. Officer Brady removed his arm from her grasp and asked her not to grab him. Bovey then proclaimed to Brady that he hit his wife and ordered him not to talk to his wife that way. Officer Brady told Mr. Bovey that he still needed to see his driver's license. Bovey then began to yell and scream at Officer Brady, telling him that he already had his license and accused him of making false accusations. Bovey yelled and screamed again that Brady was making false accusations, that he had hit his wife, that he was tired of these abuses toward him and his wife.

Officer Brady then told Bovey to calm down, to settle down, that he was being disorderly, that he could be arrested and jailed for being disorderly, and asked him again to produce his registration so that he could write the ticket and Bovey could "tell it to the Judge." Bovey continued to yell and scream, gesturing with his hands in Brady's face, about false accusations. Officer Brady warned Bovey several more times about calming down and producing his registration. Bovey did not produce his registration. Bovey again informed Brady that he was an attorney and that Brady

could not arrest him and jail him and that he wasn't going to take him anywhere. Brady then informed Bovey that he was under arrest and asked him to place his hands on top of his vehicle. Bovey refused to do so and Brady took hold of Bovey's left hand and placed it on top of his vehicle and handcuffed his left wrist, with one hand, and brought it behind his back at waist level. Mrs. Bovey touched Brady's arm again and again Brady jerked out of her grasp.

Brady asked Bovey to give him his right hand so that he could handcuff it and Bovey refused. Brady attempted to cuff the right hand but without success. Thereupon, Brady forcibly walked Bovey to his police vehicle with Bovey's left hand handcuffed and his right hand free. Bovey forcibly resisted all the way. Mrs. Bovey again touched Brady, this time on his right arm and Brady again told her not to do that and warned her that she could be arrested for interfering. Bovey demanded to know who Brady was and when Brady told him, he stated to his wife, "That's Brady, take note of what he is doing." Bovey told him that he was embarrassing him in front of his neighbors. No neighbors were immediately present.

When Brady arrived at his police vehicle with Bovey in tow, he again attempted to handcuff Bovey's right hand and Bovey again refused to cooperate. At this time, Edward Steiner was passing by the scene and noticed a struggle between Brady and Bovey and it appeared to him that Bovey was resisting Brady's efforts to handcuff him. Steiner hurried to Lora Letson's house, which was near the area, dropped his daughter off and asked Mrs. Letson to call the police for help, which she did.

At this time, Indiana State Trooper Michael McCormick, who had been running radar with Brady at the intersection previously, arrived at the scene and after several attempts was able to handcuff Bovey's right hand. Then both officers attempted to place Bovey in Brady's police vehicle. Bovey refused to get in, claiming that he was too big to fit with his hands cuffed behind his back and complained of pain, a claim well supported by the evidence. At

this time, Mrs. Bovey reached between the officers and grabbed Brady on his jacket. Brady again jerked out of her grasp and ordered her back to her vehicle telling her to shut up or she would be arrested for interfering. Brady never struck Mrs. Bovey.

Bovey then started struggling, moving his feet and jumping up and down and yelled that Brady hit his wife. Mrs. Bovey agreed that he did. Bovey's glasses fell or were knocked off at this time. Brady placed his right hand against Bovey's chest and moved him up into the door opening and ordered him not to knee him again. Bovey then informed both officers that he was going to ride with McCormick, not Brady. Brady agreed and both officers escorted Bovey to McCormick's vehicle, which was parked on Union Street. Bovey easily and without difficulty slid into the front seat, with both hands cuffed behind his back. Bovey then placed his knees on the dash of the vehicle and placed pressure on the handcuffs causing them to tighten further. The safety latch was not set on the handcuffs. For different but apparent reasons both Bovey and Brady wanted to maximize the discomfort caused by these handcuffs. Mr. Steiner came back to the scene and was told by Trooper McCormick that everything was under control. Bovey told Brady he would get his badge.

Brady then radioed into headquarters that he was enroute to jail and requested that the Sergeant in command meet him there. He also radioed Car 1–7 to follow McCormick. This was Officer Money, who arrived to assist in response to headquarters' request. Brady proceeded to the Tippecanoe County Jail with McCormick and Money following. On the way to the jail McCormick stopped his vehicle and removed Bovey's handcuffs after his complaint about the pain.

At the jail, Brady had no contact or conversation with Bovey. Brady informed Sgt. Moser of the charges: Speeding, Resisting Law Enforcement, Assault and Battery on a Policeman and Disorderly Conduct. Brady typed his jail card and then

left the jail. Brady was there approximately ten minutes and left Bovey's driver's license at the jail.

Brady proceeded to headquarters and dropped Brent Lank off. Brady started to fill out his report and the speeding ticket and requested that headquarters run a 1027 drivers license check and a 1028 vehicle registration check on Bovey, which was done. Brady then went to Home Hospital, after which he proceeded back to headquarters and completed his report. Brent Lank was taken home by another officer.

Bovey was taken from the jail to St. Elizabeth Hospital after complaining that his left arm was broken. He was treated by Dr. Mitchell/Flynn, who diagnosed a "mild abrasion/sprain of the left wrist." He made no other significant findings. Bovey informed Keith Hall, the admitting paramedic, that he was diabetic and stated that he was on insulin. Bovey did not request treatment for his diabetic condition, which was a preexisting illness. Dr. Mitchell/Flynn did not note any diabetic distress. Bovey's only complaint at the hospital was with regard to his hands and his arm. Bovey requested a device for his arm and was fitted with a splint, by paramedic Michael McCarthy, for comfort only. Neither the paramedics nor Dr. Michell/Flynn, who was experienced in dealing with people in insulin shock or hypoglycemia, high or low blood sugar, felt that Mr. Bovey was having any difficulty with his diabetic condition.

Bovey was then taken to police headquarters for processing and then taken back to the Tippecanoe County Jail, where he complained that he was chronically ill and requested not to be put in a cell. He did not request further treatment at the hospital, nor did he mention that he was in diabetic distress. He was strip-searched and his body cavity was checked for drugs by jailer Mike Pardue, an employee of the Tippecanoe County Sheriff. At that time, it was the policy of the Tippecanoe County Sheriff to strip-search everyone who was to be placed in the jail. This court finds that it was common knowledge, practice, custom and usage that persons arrested by the Police Department of the City of Lafayette were placed in the Tippecanoe County Jail and strip-searched upon entry.

The next day, November 30, 1982, Mr. and Mrs. Bovey arrived at headquarters to meet with Captain Thomas Leach, head of Internal Affairs. They registered a complaint over their treatment, mainly by Officer Brady. They complained of an illegal arrest and excessive use of force. Bovey was given the speeding citation made out by Brady the night before.

Captain Leach took statements from all parties involved, including the participants Brady and Mr. and Mrs. Bovey, as well as witnesses Brent Lank and Trooper Michael McCormick. He caused Mrs. Letson and Mr. Steiner to be interviewed. He concluded that there were no departmental violations by Officer Brady and closed his investigation. Chief Milks announced the results to the news media.

The sole responsibility for hiring and firing of Lafayette policemen rests with the Lafayette Police Civil Service Commission (Merit Board). It is composed of a five member board, comprised of two members elected by the police, two appointed by the City Council and one appointed by the Mayor. It conducts its own hearings and has its own attorney.

Mr. Bovey has no permanent physical impairment or limitation as a result of this incident. He consulted his doctor, Dr. Kauffman, after the incident, but received no treatment for his hands. The only treatment he received for his hands was at St. Elizabeth Hospital the night of the incident. Dr. Kauffman also treated him for his diabetes. There is no substantial evidence that this incident aggravated the preexisting diabetes.

Mrs. Bovey and her children were not injured or physically harmed in any way.

It is not for this court to determine here whether or not Richard Bovey was guilty of speeding by going approximately 49 miles per hour in a 30 mile per hour speed zone, but the evidence points very much in that direction. It is also beyond any dispute that Officer Brady had probable cause

to stop Richard Bovey's vehicle for a violation of the speeding ordinance. Richard Bovey does not here challenge that probable cause although he does here assert categorically his innocence of the speeding charge. It is the view of this court that guilt with reference to the speeding charge should be determined in a court of appropriate jurisdiction with all deliberate speed.

It is also undisputed in the record that Richard Bovey, a resident of Tippecanoe County, Indiana, driving an automobile with a license prefix indicating residence in Tippecanoe County, Indiana, with a valid Indiana driver's license could not have been both arrested *and taken to jail* for the speeding offense. The defendants concede this.

After being stopped Richard Bovey and perhaps his wife, made strongly vocal inquiries of Officer Brady as to the reasons for their being stopped. It is highly likely that those requests were made in an obnoxious and intimidating manner, given the personal characteristics of both Mr. and Mrs. Bovey that were readily apparent to this court in observing them during the trial of this case. It is correct that Richard Bovey did secure and deliver to Brady his driver's license. It is correct that Brady requested the certificate of registration on the Bovey vehicle and Bovey made an unsuccessful attempt to locate the same in the glove compartment of that vehicle. There is evidence that Mrs. Bovey spoke to Brady and reached out of the car window and touched him. There is no evidence that satisfies this court that Mrs. Bovey ever intended in any way to physically and criminally assault Officer Brady. Officer Brady himself indicated that he was in no fear of serious physical danger at any time during this incident. It is beyond dispute that as a general proposition one of the most dangerous things that a police officer does in the routine of duty is to approach an automobile alone at night for a traffic violation stop. While it is correct that in the course of these brief events Officer Brady both received and distributed verbal abuse, none of it amounted to a threat upon his physical safety.

It is also readily apparent that Officer Brady used extremely poor judgment in instantaneously attempting to handcuff Richard Bovey at the time and under the circumstances that he attempted to do so. It is a close case but the conduct of Officer Brady stopped just short of being a violation of the due process rights of Richard Bovey.

Officer Brady testified that he did not secure the name of the owner of the automobile which he was in the process of stopping before he approached the same. He did report the license number and his location to the Police Radio Operator. This court generally credits that testimony. Officer Brady further testified that he did not realize that Richard Bovey was an attorney in Lafayette, Indiana, when he saw his name on the driver's license and saw him in person. This court has the greatest of difficulty in crediting that part of his testimony. In and before November of 1982 Richard Bovey was a very vocal and visible member of the legal profession in Lafayette, Indiana. He was particularly well known within the police department. The sign of his law office which Officer Brady drove by many times was clearly visible. Therefore this court cannot credit that bit of testimony by Officer Brady. This court believes that Officer Brady did know precisely whom he was dealing with at the time in question. This simple fact neither condemns nor excuses the way in which this officer chose to conduct himself in that church parking lot in the presence of Mr. Bovey, his wife, and two of their children.

## II.

■ It is conceded by all parties that any relevant action by Brady and the City of Lafayette constitutes state action under 42 U.S.C. § 1983. The first inquiry in a Section 1983 case must be whether a plaintiff has been deprived of a right "secured by the Constitution and laws" of the United States. *Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979).

This court need pause only briefly while considering the claims of Mrs. Bovey. She was not in any way assaulted or physically abused by any defendant or by any agent of any defendant. At all times those who dealt with Mrs. Bovey and her children did so with respect for her and their rights. Under *Baker v. McCollan* none of her rights were violated. Following *Baker* a much closer examination of the situation must be made as to the plaintiff Richard Bovey. It is necessary to examine several Indiana statutes and the authorities thereunder to measure the conduct of Brady at this scene.

■ In determining the legality of Richard Bovey's arrest, it is irrelevant whether his alleged offense be a felony or a misdemeanor, because if any arrestable offense occurred, it occurred in the presence of the arresting officer. A critical analysis of the facts and evidence in this case raises a very close question as to whether at the moment of arrest, an arrestable offense had occurred, and whether reasonable cause existed for Brady to believe that any arrestable offense had occurred. An analysis of the various charges brought and contentions made by the defendants must be examined in order.

A. *Resisting Law Enforcement.* The relevant statute is Ind.Code § 35–44–3–3 which states:

(a) A person who knowingly or intentionally:

(1) Forcibly resists, obstructs, or interferes with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the execution of his duties as an officer:

(2) Forcibly resists, obstructs, or interferes with the authorized service or execution of a civil or criminal process or order of a court; or

(3) Flees from a law enforcement officer after the officer has, by visible or audible means, identified himself and ordered the person to stop; commits resisting law enforcement, a Class A misdemeanor. However, the offense is a class D felony if, while committing it, the person draws or uses a deadly weapon or inflicts bodily injury on another person.

(b) For purposes of this section, a law enforcement officer includes an alcoholic beverage enforcement officer.

In 1978 the Court of Appeals of Indiana construed this statute in a light favorable to the position of Brady in this case. See *Fields v. State,* 178 Ind.App. 350, 382 N.E.2d 972 (1978) where Judge Lowdermilk, speaking for the Court, stated:

We also hold that Fields was properly convicted and sentenced for resisting and interfering with a police officer. We recognize that we have held that Fields' initial arrest for interfering with a police officer was illegal. But we also held that Fields had no right to resist a peaceful arrest, even if that arrest was unlawful. When he forcefully resisted Officer Fields' attempt to take him into custody Willison Fields then committed the crime of resisting a police officer in that the law has given a police officer the right and privilege to take an arrestee into custody, even where that arrest is unlawful, with the proviso that that officer and the governmental unit which he represents may be liable in a civil action for false arrest. Fields' actions subsequent to the unlawful arrest constituted crimes for which he must pay the penalty. But those subsequent actions in no way impair his right to seek redress in a civil action.

This statute as construed gave Brady sufficient cause to believe that a violation was occurring.

B. *Battery on a Law Enforcement Officer.* Ind.Code § 35–42–2–1 provides:

A person who knowingly touches another person in a rude, insolent, or angry manner commits battery, a class B misdemeanor. However, the offense is:

(1) A class A misdemeanor if it results in bodily injury to any other person, or if it is committed against a law enforcement officer or against a person summoned and directed by the officer while the officer is engaged in the execution of his official duty;

(2) A class D felony if it results in bodily injury to:

(A) a law enforcement officer or a person summoned and directed by a law enforcement officer while the officer is engaged in the execution of his official duty;

(B) A person less than thirteen [13] years of age and is committed by a person at least eighteen [18] years of age;

(C) A dependent (as defined by IC 35–46–1–1(2)) and is committed by a person having the care of the dependent whether the care is assumed voluntarily or because of a legal obligation; or

(D) A married person and is committed by the person's spouse and the spouse committing the battery was previously convicted of battery in which the victim was the same spouse.

(3) A class C felony if it results in serious bodily injury to any other person or if it is committed by means of a deadly weapon.

For purposes of this section a law enforcement officer includes an alcoholic beverage enforcement officer.

This statute has been most recently construed in *Carty v. State*, Ind.App., 421 N.E.2d 1151 (1981). Given that Brady was clearly a de jure officer and not just a de facto officer there is evidence here from which Brady had reasonable cause to believe that Richard Bovey was in the process of violating this statute.

C. *Failure to Obey Law Enforcement Officer.* This charge appears to have been made under Ind.Code § 9–4–1–24 making it a class C misdemeanor for a person to fail to comply with any lawful order or direction of a law enforcement officer invested by law with authority to direct, control or regulate traffic. This statute deals generally with failure to obey traffic directions or traffic orders. It is revealing that although Ind.Code § 9–4–1–24 has been in effect since 1939 there is not a single reported case dealing with same. If this were the only statute relied on by Brady this court would be hard pressed to justify his action thereon.

D. *Disorderly Conduct.* Ind.Code § 35–45–1–3 provides:

A person who recklessly, knowingly or intentionally:

(1) Engages in fighting or in tumultuous conduct;

(2) Makes unreasonable noise and continues to do so after being asked to stop;

(3) Disrupts a lawful assembly of persons; or

(4) Obstructs vehicular or pedestrian traffic; commits disorderly conduct, a class B misdemeanor.

This statute must be read in the light of *Hess v. State*, 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) reversing 260 Ind. 247, 297 N.E.2d 413 (1973).

■ The speech and conduct which occurred prior to the arrest by Brady are constitutionally protected free speech and petition for redress under the First Amendment, and do not constitute a violation of Ind.Code § 35–45–1–3. The statements allegedly made by Richard Bovey during this narrow time frame do not exceed the other limits of constitutionally protected speech. Clearly Richard Bovey had a right to ask "What's the matter, Officer?" Also, he had a right to say, "I couldn't have been going that fast." Likewise he had a right to ask "What are you accusing me of?" Further, his statement which Brady took offense at "Don't talk to my wife in that tone of voice!" is not the impermissable kind of words likely to activate immediate violence. The Supreme Court in the case of *Hess v. State*, 414 U.S. 105, 107, 94 S.Ct. 326, 328, 38 L.Ed.2d 303 (1973) declared that a statute would be unconstitutional if it attempted to criminalize language which falls short of fighting words or words likely to activate immediate violence.

The same reasoning applies to the remaining statements of Bovey at the scene. He had a right to say, "I already gave you my driver's license". He had a right to say, "I am a lawyer and I know my rights". There is no evidence tending to show any shouts of obscenity, foul language, profanity, fighting words or any words inherently

likely to insult or activate violence were made.

There can be no doubt that a citizen who is stopped by a police officer for a violation of a speeding ordinance or statute may exercise the right of free speech under Amendment I of the Constitution of the United States by inquiring as to the basis for the alleged offense. In this case the conduct of Richard Bovey was entirely oral except his physical resistance to being handcuffed. The limits on this free speech right to address an arresting officer are narrowly proscribed. See *Hess v. State,* 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973). See also the perceptive opinion of Justice Harlan in *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). There is no suggestion here that Richard Bovey used obscene speech to Dennis Brady. Nor is there a suggestion that such speech amounted to "fighting words". See *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). See also *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Neither is there a suggestion that such speech by Bovey amounted to a public nuisance that invaded privacy interests. In this case there was no evidence that Richard Bovey's speech to the police officer was designed to incite further lawless action. See *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969).

In *Mesarosh v. State,* Ind.App., 459 N.E.2d 426 (1984), Judge Conover stated:

Despite the sweeping language of the First Amendment, the United States Supreme Court has held several categories of "speech" fall outside the ambit of its protection. These categories include: (a) obscenity, *see generally Miller v. California,* (1973) 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419; (b) speech in circumstances where its time, place or manner of delivery unduly interferes with privacy of the home or a similar competing interest, sometimes called "nuisance" speech, *see e.g. Kovacs v. Cooper,* (1949) 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 and *see generally* Nowak, Routunda, Young, *Handbook on Constitutional Law* 812–17 (1978); (c) speech advocating immediate violence or similar lawless action which is likely to follow, *see generally Hess v. Indiana,* (1973) 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303; *Brandenburg v. Ohio,* (1969) 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430; and (d) "fighting words," personally abusive language likely to provoke a violent reaction by listeners toward the speaker, *see generally Chaplinsky v. New Hampshire,* (1942), 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031, discussed *infra.* (footnote omitted).

Given the basic facts in *Mesarosh* the language used by Richard Bovey falls just short of violating Ind.Code § 35–45–1–3(2).

E. Speeding. Speeding is a traffic offense which is declared to be an infraction under the Indiana statute. Ind.Code § 34–4–32–2; Ind.Code § 9–4–1–57. Such infractions are not arrestable offenses in the factual context of this case. Ind.Code § 34–4–32–2.

■ Whether Brady's action were based upon sufficient probable cause or not, a section 1983 claim could be viable if the conduct of Officer Brady in making the arrest was "so offensive, under the circumstances, as to shock the conscience of the trier of fact." *Alberts v. City of New York,* 549 F.Supp. 227 (S.D.N.Y.1982). See also *Moats v. Village of Schaumburg,* 562 F.Supp. 624 (N.D.Ill.1983); and *Lenard v. Argento,* 699 F.2d 874 (7th Cir.1983).

Bovey sustained a slight injury to his left wrist. The evidence indicated that handcuffs do leave marks on the wrists and hands from the person's own movements, which depend upon the amount of struggling or resisting that takes place. There can be no serious dispute that Bovey physically resisted Brady's efforts to take him into custody. It appeared to Mr. Steiner that he was resisting, as well as Trooper McCormick and Brent Lank. The evidence indicated that a custom and practice exists whereby everyone taken to jail by the Lafayette Police Department is handcuffed.

Further, it was clear from the testimony that Bovey put pressure on the handcuffs when he sat in McCormick's vehicle. The more pressure applied, the tighter they became. Brady did not set the safety lock and the testimony indicated, even from Officer Metzer, that the safety is normally not set for short rides to jail. The handcuffs act as a restraint and prevent resistance as they finally did with Mr. Bovey.

The testimony of Brady, Lank and McCormick does coincide on the major points. Those are Bovey's verbal attack upon Brady, the yelling and the shouting, (which Mrs. Bovey admitted took place), the argument, the physical resistance to being handcuffed, the refusal to get in the police vehicle and the kneeing of Officer Brady, whether deliberate or not.

As *Moats v. Village of Schaumburg*, 562 F.Supp. 624, states:

Behavior that might constitute a tort under state law is not necessarily compensable under section 1983, however (citations omitted). "[N]ot every push or shove even it it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." The test for imposing liability is whether the officer's conduct "shocks the conscience." (citations omitted).

*Id.* at 629, 630, quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973).

In order to keep within the confines of the Eighth and Fourteenth Amendments, only force reasonable under the circumstances is proper.

*Id.* at 629

Even if Crawford proved at trial that Henry roughly twisted her arm and that she did not resist arrest, her claim does not rise to the level of a constitutional violation. Crawford does not claim to have consulted a doctor for her alleged injuries. No proof of permanent or physical injury has been suggested.

Certainly the Court disapproves any unnecessary use of force by police officers. However, the alleged arm-twisting is not

behavior that would shock the conscience of a reasonable person.

*Id.* at 630.

As *Alberts v. City of New York* states:

Plaintiff further argues that the alleged excessive force displayed by Officer Ogletree while effecting her arrest violated her constitutional rights. Even though Ms. Alberts has failed to prove that her arrest was not based on probable cause, the arrest might still be violative of section 1983 if "the conduct of the arresting officers in making the arrest was so offensive, under the circumstances, as to 'shock the conscience' of the trier of fact." Pratt, 533 F.Supp. at 115. The conduct of Ogletree is not to be condoned and it appeared at trial with the benefit of hindsight that other means might have been available to subdue the plaintiff. However, it is this court's duty not to scrutinize the officer's behavior but instead to determine if the force he utilized is excessive. In order to determine if the force was excessive

"a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."

549 F.Supp. at 232.

While hindsight might offer other means available to subdue Bovey, that is not determinative upon the issue whether the force Brady used was constitutionally excessive. It was not. Bovey was not seriously hurt and in order for the court's conscience to be shocked generally Bovey would have had to sustain a serious injury. Therefore, the force used by Brady was not violative of Bovey's right to due process under the Fourteenth Amendment and therefore is not actionable under Section 1983.

**III.**

■ This court is extremely troubled by the strip-searching of Richard Bovey at the

Tippecanoe County Jail. This court has had occasion to deal with that issue in *Doe v. Renfrow*, 475 F.Supp. 1012 (N.E.Ind. 1979), *aff'd*, 631 F.2d 91 (7th Cir.), *reh. denied*, 635 F.2d 582 (7th Cir.1980), *cert. denied*, 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981). In that case, this court held the nude search of a female junior high school student by school officials on school grounds to have been unreasonable, despite the fact that a trained drug-detecting canine had "alerted" to the scent of drugs on the girl's person; that the standard applied was the lesser one of "reasonable cause to believe"; and that the school officials enjoyed a form of *in loco parentis* relationship with the student. *Id.* at 1024, 101 S.Ct. at 3017.

The Court of Appeals for the Seventh Circuit was even less gentle with those involved in the strip-search than was this court. 631 F.2d at 92–93. *See also* the dissents of Judge Swygert, 631 F.2d at 93–94; 635 F.2d at 582–84; and Justice Brennan, 451 U.S. at 1025–28, 101 S.Ct. at 3017–19.

In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court held that a pretrial detainee may be strip-searched as a means of maintaining jail-type security, *i.e.*, to prevent the possibility of contraband being smuggled into the prison. *Id.* at 558, 99 S.Ct. at 1884. It should be borne in mind, however, that these strip-searches (including body cavity searches), were employed only following contact visits between the detainees and persons from outside the institution. Hence the admonition of Justice Frankfurter that legal doctrines "derive meaning and content from the circumstances that give rise to them and from the purposes they are designed to serve. To these they are bound as is a live tree to its roots." *Reid v. Covert*, 354 U.S. 1, 50, 77 S.Ct. 1222, 1248, 1 L.Ed.2d 1148 (Frankfurter, J., concurring).

The comments of Justice Rehnquist, speaking for the court in *Bell, supra,* are worthy of consideration here:

The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence.

441 U.S. at 559, 99 S.Ct. at 1884 (citations omitted). For more recent authority on strip searches in light of the decision in *Bell v. Wolfish, supra,* see *McKinley v. Trattles*, 732 F.2d 1320 (7th Cir.1984); *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir.1983); *Salinas v. Breier*, 695 F.2d 1073 (7th Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 119, 78 L.Ed.2d 118 (1983); *Iskander v. Village of Forest Park*, 690 F.2d 126 (7th Cir.1982); *Tikalsky v. City of Chicago*, 687 F.2d 175 (7th Cir. 1982); *Bono v. Saxbe*, 620 F.2d 609 (7th Cir.1980); *Roscom v. City of Chicago*, 570 F.Supp. 1259 (N.D.Ill.1983); *Roscom v. City of Chicago*, 550 F.Supp. 153 (N.D.Ill. 1982); *Hendrix v. Faulkner*, 525 F.Supp. 435 (N.D.Ind.1981), *aff'd in part, rev'd & rem. in part sub nom. Wellman v. Faulkner*, 715 F.2d 269 (7th Cir.1983).

The factual setting of *Bell v. Wolfish, supra,* is light years away from that of this case. There is little justification for the strip search of Richard Bovey by anyone here.

The most recent expression on this subject from our Court of Appeals, *McKinley v. Trattles*, 732 F.2d 1320 (7th Cir.1984), demonstrates once again the delicate nature of the privacy rights involved, even where the *right* to strip search is clearly established. It was certainly not clearly established under the facts of this case. There was a clear alternative available that could have and should have avoided the personally demeaning practice that Richard Bovey was forced to endure. Additionally

Richard Bovey was unnecessarily touched in the process of the strip search. That touching was not quite at the level of grossness found in *McKinley* but it was nonetheless improper under the facts here. Judge Shadur makes a strong point of lack of touching in *Roscom*, 570 F.Supp. at 1261.

In the facts of this case the strip search clearly violated the constitutional rights of Richard Bovey.

■ The most difficult legal question to be decided in this case involves the legal responsibility for the unwarranted strip search of Richard Bovey. The result depends on the interplay between three Supreme Court decisions, namely, *Monell v. Dept. of Soc. Serv. of City of N.Y.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) and *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

In *Monell*, at 436 U.S. 694, 98 S.Ct. 2037, the court stated:

> We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983. Since this case unquestionably involves official policy as the moving force of the constitutional violation found by the District Court, see supra, 436 U.S. at 660–662, and n. 2, 98 S.Ct. at 2020, and n. 2, 23 must reverse the judgment below. In so doing, we have no occasion to address, and do not address, what the full contours of municipal liability under § 1983 may be. We have attempted only to sketch so much of the § 1983 cause of action against a local government as is apparent from the history of the 1871 Act and our prior cases, and we expressly leave further development of this action to another day.

In *Owen* the court concluded:

In sum, our decision holding that municipalities have no immunity from damages liability flowing from their constitutional violations harmonizes well with developments in the common law and our own pronouncements on official immunities under § 1983. Doctrines of tort law have changed significantly over the past century, and our notions of governmental responsibility should properly reflect that evolution. No longer is individual "blameworthiness" the acid test of liability; the principle of equitable loss-spreading has joined fault as a factor in distributing the costs among the three principals in the scenario of the § 1983 cause of action: the victim of the constitutional deprivation; the officer whose conduct caused the injury; and the public, as represented by the municipal entity. The innocent individual who is harmed by an abuse of governmental authority is assured that he will be compensated for his injury. The offending official, so long as he conducts himself in good faith, may go about his business secure in the knowledge that a qualified immunity will protect him from personal liability for damages that are more appropriately chargeable to the populace as a whole. And the public will be forced to bear only the costs of injury inflicted by the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell v. New York City Dept. of Services*, 436 U.S. at 694, 98 S.Ct. at 2037.

In *Harlow* the court stated:

Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be

expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.

By defining the limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken "with independence and without fear of consequences." Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967).

The City of Lafayette had no long term jail facilities. It did have short term holding cells at Police Headquarters. It was common knowledge and practice throughout the Police Department that the Tippecanoe County Jail was used exclusively by the City for longer term arrestees. Such was clearly a practice custom, policy and usage as outlined in Monell. There was widespread joint usage of the Tippecanoe County Jail by both the City and County even though the Sheriff, an elected state and county official, has the basic legal responsibility for operating the Jail. Neither the Sheriff of Tippecanoe County nor any subordinates of the Sheriff are party defendants here.

It is also beyond real dispute that the then universal practice of strip searching all arrestees who were confined in the Jail upon entry was well known to many officials of the City of Lafayette. As far as arrestees of the City of Lafayette were concerned the strip searching practice in the Jail became that of the City. This conclusion is well supported by the reasoning in Monell. This case is a good example of flesh being put on the Monell bones.

It is therefore the conclusion of this court that the strip search of Richard Bovey was a direct result of a clearly established custom, practice, policy, and usage known to, sanctioned by and participated in by the City of Lafayette.

The City of Lafayette is not entitled to assert as a defense the immunity described in Owen. It is equally clear that the City is not entitled to assert the immunity defense as described in Harlow v. Fitzgerald. This court does find and holds that Dennis Brady is entitled to such immunity although the question is a close one.

The factual pattern is also relevant here. In Doe v. Renfrow the actual strip search of the female student was done by a police matron not in the employ of the school corporation.

The reasoning and result here announced finds strong support in Judge Eschbach's careful analysis in Iskander v. Village of Forest Park, 690 F.2d 126 (7th Cir.1982). Likewise, the reasoning and result regarding a policy of blanket strip searches as found in Tinette v. Wittke, 479 F.Supp. 486 (E.D.Wisc.1979), aff'd, 620 F.2d 160 (7th Cir.1980), is also relevant.

In predicating the liability of the City on Monell custom, usage, policy, and practice this court is not limited to the conduct of defendant Brady but may look to all relevant conduct by all authorized agents of the City.

In this record there is the necessary link or nexus between the policy and practice and the corporate city that was found wanting in *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

The defendants cite *Jordan v. City of Chicago,* 505 F.Supp. 1 (N.D.Ill.1980) which on the issue of the liability of a municipal corporation predates *Owen v. City of Independence.*

The holding here in no way rests on the type of *respondeat superior* that was involved in *Adams v. Pate,* 445 F.2d 105 (7th Cir.1971), or that discussed in the final paragraphs of *Wellman v. Faulkner,* 715 F.2d 269, 276 (7th Cir.1983).

There is substantial evidence of custom, practice, policy, and usage by the City resulting in this strip search. There is also substantial evidence that many in authority by the City were direct participants in that practice, usage, custom and practice.

Because of the reasoning and result here announced it is not necessary to decide the question of a police officer's immunity under Ind.Code 34–4–16.5–1 as interpreted in *Seymore National Bank v. State,* Ind., 422 N.E.2d 1223 (1981).

IV.

■ There was no evidence that indicated an agreement among any officers to deprive Bovey of his constitutional rights under 42 U.S.C. § 1985. There was no credible evidence indicating that Officer Brady knew who Bovey was prior to Bovey identifying himself. Assuming for purposes of argument only, that his investigation was intended as a "cover-up", Bovey must show "direct evidence" of an express original agreement among the conspirators to cover up the original wrong. See *Means v. City of Chicago,* 535 F.Supp. 455 (N.D. Ill.1982). Absent that showing, persons who participate only in a cover-up are not liable with the original conspirators. Further, there is no evidence in the record that would indicate that Leach agreed with Brady and others to cover-up the incident. The fact that he evidenced some tendencies in this trial that detracted from his credibil-

ity does not a section 1985 conspiracy make.

There was no Section 1985 conspiracy because *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), requires a class-based motive or intent, *i.e.* racial, as part of the conspiratorial agreement. There is nothing in the record that even remotely indicates the possibility of a class-based motive in this case. Therefore, no section 1985 conspiracy has been shown here.

V.

■ Plaintiff's claim of negligent hiring and retention against the City must fail also because there is no evidence that Brady was unfit to be a policeman or that he engaged in serious relevant prior misconduct. See *Tindall v. Enderle,* 162 Ind. App. 524, 320 N.E.2d 764 (1974) and *Shipley v. City of South Bend,* 175 Ind.App. 464, 372 N.E.2d 490 (1978).

Finally, the testimony of Chief Milks established that the Merit Board (officially known as the Lafayette Police Civil Service Commission) has the exclusive jurisdiction with regard to hiring and firing of Lafayette policemen. See Ind.Code § 19–1–14.-2–2 *et seq.* The Merit Board is a separate *sui juris* entity. It has its own Board, its own attorney and conducts its own hearings. They make their own decisions, independent of the City Council, the Mayor or any city official. A holding that the City of Lafayette was responsible for the acts of the Merit Board would have to be based solely upon the theory of *respondeat superior.* However, since the City has no right to control the decisions of the Merit Board, there can be no *respondeat superior* or agency.

At any rate, whether or not the City is responsible for the actions of the Merit Board is not relevant here. There are no facts in the record which tend to prove that Brady and other officers were negligently hired and retained and the plaintiffs have failed to carry their burden on this issue. There was no evidence to indicate that the testing procedures used to hire policemen

and the procedures used to discipline or terminate policemen in any way contributed to or proximately caused this incident.

The conduct of the defendant City in selecting and appointing police was in accord with Indiana statutory law. To the extent that the plaintiffs have attempted to assert claims for negligent hiring and retention under 42 U.S.C. § 1983, the same have no basis in fact or law in this case. While the authority cited by the plaintiffs may suggest the desirability of psychological testing for police applicants, such was not required under the law applicable to this case and was not mandated by the Fourteenth Amendment at any time relevant in this case.[1]

Consideration of the damage issue arising from the unconstitutional strip search of Richard Bovey must begin with *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). (It must be here emphasized that the award of damages is based on a narrow slice of the plaintiffs' claims and there is no legal foundation for most of his claims.) *Carey* held that where procedural due process rights are denied, nominal damages may be presumed but compensatory damages must be proved. In *Lenard v. Argento,* 699 F.2d 874 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983), *Carey* is applied to decide that where there is infringement of a *substantive* constitutional right, more than nominal damages may be awarded even in absence of proof of actual injury. The claim here is definitely one for substantive rather than procedural due process as defined by Justice Stewart in *Crowder v. Lash,* 687 F.2d 996 (7th Cir.1982).

Even if there were a legal basis for the plaintiffs' claims other than the strip search most of the damage is offered by the plaintiff Richard Bovey as to loss of income is highly speculative and not per-

suasive. It appears that the present decline in his receipts as a lawyer are not directly related to the defendants' conduct in this case but results primarily from his conduct and his particular manner of exercising his free speech rights in the recent past. The plaintiff has failed to convince this court of his entitlement to any damages save those for his strip search.

## VI.

The record in this case abounds in a lack of professionalism and common sense by a member of the legal profession and a member of the Lafayette Police Department, both of whom hold positions of substantial responsibility in society. The conduct of the parties and those acting for them was often petty and mean. The gamesmanship of the Prosecutor of the 23d Judicial Circuit of the State of Indiana in regard to filing, dismissing, amending and refiling criminal charges against Richard Bovey is an additional manifestation of this characteristic as found in the record of this case.

On the basis of the full record before this court, it is this court's unquestioned conclusion that at no time did Richard Bovey have either the specific intent or the general intent to commit any of the crimes with which he was subsequently charged. This conclusion is made in spite of his grossly unprofessional conduct on the evening of November 29, 1982. It is highly doubtful that any of his conduct would support a conviction of any of the crimes with which he was charged except for the misdemeanor of driving in excess of the speed limit. The conduct of both Richard Bovey and Dennis Brady created a volatile situation that has been a disservice to both the professions of the law and law enforcement. The events have diverted substantial resources in thousands of man hours from

---

1. While *Hild v. Bruner,* 496 F.Supp. 93 (D.N.J. 1980) may state a desirable method of screening and testing local police officers such was not mandatory at any time relevant here, under any statutory or case authority in Indiana. *Hild* stands for the proposition that the failure of the *Town* of Newton to conduct some kind of psychological tests for its police officers could be deemed to constitute *gross negligence. Hild* is not binding on this court as authority under 42 U.S.C. § 1983 or in regard to the pendent state claims under Indiana law. The precise relevant holding in *Hild* has not been announced in this circuit. All of the police officers involved in this case were selected according to the then established requirements of the law of Indiana.

the far more important activities of law enforcement to an event that has many of the earmarks of a second rate soap opera. It is beyond dispute that a lawyer does not lay down his basic constitutional rights upon entry into the legal profession any more than a police officer does upon entry into the law enforcement profession. It is fundamentally correct that a lawyer who is stopped for a speeding offense enjoys no more but no less under the Constitution of the United States than does any other citizen. It is readily apparent to this court that Richard Bovey was attempting, somewhat crudely, at the time and place in question to ask for more not less.

The subsequent handling of Richard Bovey, including the manner in which he was handcuffed, the manner in which he was taken to the hospital and the manner in which he was finally processed and placed in jail leave a very great deal to be desired. A number of Lafayette police personnel were less than discreet in expressing their glee at the public humiliation that was involved in the arrest and jailing of Richard Bovey. Such was grossly unprofessional.

It is not for this court to sit as a court of review in regard to the internal review procedures of the Lafayette Police Department. The court did have an opportunity to observe, on the witness stand and in the courtroom, the conduct of Captain Leach. It is readily apparent that he was a highly partisan participant in this case for the defendants and engaged in the unusual conduct of coming into the well of the court and conferring with counsel for the defendants during the cross-examination of Officer Metsker. Such was noted at the time.

It can be fervently hoped that now the resources above described can be directed to problems of more importance and more pressing concern to the community of Lafayette, Indiana, since it is this court's view that the single loose end that should be tied up at the earliest possible time is a determination of whether or not Richard Bovey is guilty of speeding.

## VII.

## JUDGMENT

The court orders that judgment shall enter for the defendant Dennis Brady against the plaintiffs, Richard Bovey and Michelle Bovey. Judgment shall enter for the defendants, City of Lafayette and Dennis Brady, and against the plaintiff, Michelle Bovey. Judgment shall enter for the plaintiff, Richard Bovey, and against the defendant, City of Lafayette, in the sum of $2000.00. Because of the divided nature of the judgment and relief awarded, each party will bear its own costs.